## Andrew Rosing vs. Teachers' Retirement System & another[1] (and two companion cases[2]).

Suffolk. September 13, 2010. - November 12, 2010.

Present: Ireland, Spina, Cordy, Botsford, & Gants, JJ.

*Public Employment,* Retirement. *Retirement. School and School Committee,* Retirement benefits. *Social Security Act. Statute,* Construction. *Administrative Law,* Judicial review.

The Contributory Retirement Appeal Board erred in denying the purchase of creditable service toward retirement by retired teachers, who were members of the Commonwealth's teachers' retirement system, for their employment in nonpublic schools funded in whole or in part by the Commonwealth, where the members' entitlement to receive Social Security benefits did not bar their eligibility, under G. L. c. 32, § 4 (1) (*p*), to purchase such credit. [289-294]

Civil actions commenced in the Superior Court Department, one on January 18, 2007, and two on July 9, 2007, respectively.

After consolidation, the case was heard by *Thomas E. Connolly*, J., on motions for judgment on the pleadings.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Joseph Sandulli* for Andrew Rosing & others.

*Robert L. Quinan, Jr.,* Assistant Attorney General, for Contributory Retirement Appeal Board.

*James H. Salvie,* Special Assistant Attorney General (*James C. O'Leary* with him) for Teachers' Retirement System.

*Grace H. Lee & Melinda E. Troy,* for State Board of Retirement, amicus curiae, submitted a brief.

Ireland, J. We transferred these cases from the Appeals Court to determine whether, under G. L. c. 32, § 4 (1) (*p*), retired

---

[1]Contributory Retirement Appeal Board.

[2]Natalie Goodman *vs.* Teachers' Retirement System & another, and Bonnie Langendorfer *vs.* Teachers' Retirement System & another.

teachers who are members of the Commonwealth's teachers' retirement system (members) are eligible to purchase creditable service toward retirement (credit or service credit) for their non-public school work with special needs students at institutions funded, in whole or part, by the Commonwealth, for which they have earned Social Security benefits. Although G. L. c. 32, § 4 (1) (*p*), allows a member to purchase credit for certain non-public school employment, if the member is "entitled to receive a retirement allowance, annuity or pension from any other source," the member is barred from such purchase (exclusion). In 2004, after almost thirty years of allowing members to purchase credit regardless of whether they were entitled to Social Security bene-fits, the teachers' retirement board (board) reversed its interpreta-tion of this provision and denied each of the plaintiffs the right to purchase such credit. When the plaintiffs appealed, the board argued that each had earned Social Security benefits and thus their service fell under the statute's exclusionary language. The division of administrative law appeals (DALA), Contributory Retirement Appeal Board (CRAB), and a Superior Court judge, who consolidated the cases as to the Social Security issue, affirmed.[3] See G. L. c. 32, § 16 (4); G. L. c. 30A, § 14. However, just after the cases were heard in the Superior Court, CRAB determined, in another case, that the board's 2004 interpretation of the statute was erroneous. Sigman *vs.* Teachers' Retirement Sys., CRAB Docket No. CR-05-0534 (Dec. 23, 2008). The plain-tiffs' position is now supported by CRAB.[4] Because we conclude that Social Security benefits do not fall under the statute's exclu-sion, we reverse.

*Statutory provisions and background.* A detailed overview of the statutory provisions, administrative practice, and case law is in order.

---

[3]The record indicates that the initial denial letters did not specify the earn-ing of Social Security benefits as the ground for denying the plaintiffs the right to purchase credit. None of the plaintiffs was a classroom teacher, and the letters stated that his or her service was not within the meaning of the statute. The only issue before this court is whether Social Security benefits fall under the exclusion of G. L. c. 32, § 4 (1) (*p*). A joint motion to stay all other proceedings in the consolidated cases was allowed by the Superior Court judge.

[4]A special assistant Attorney General was appointed to represent the board in this appeal.

1. Pursuant to G. L. c. 32, §§ 1-28A, public employees in the Commonwealth, including public school teachers, earn a retirement benefit in exchange for their services. Moreover, State or municipal employees who participate in the State retirement system do not pay into, and are not eligible to receive, Social Security retirement benefits for that service pursuant to an agreement executed between the Commonwealth and the Federal government in the 1950s. See 42 U.S.C. § 418 (2006).

Members are allowed, under certain conditions, to purchase credits for their employment in nonpublic schools under G. L. c. 32, § 4 (1) (*p*), inserted by St. 1973, c. 760, which governs purchases of creditable service for work performed after 1973.[5]

General Laws c. 32, § 4 (1) (*p*), states, in pertinent part:

> "Any member of a contributory retirement system who is engaged in a teaching position and holds a certificate issued by the department of education . . . and who was previously engaged in teaching pupils in any non-public school in the commonwealth, if the tuition of all such pupils taught was financed in part or in full by the commonwealth may . . . establish such service as creditable service . . . with the maximum credit for service in such non-public schools not to exceed ten years; *provided, that no credit shall be allowed and no payment shall be accepted for any service for which the member shall be entitled to receive a retirement allowance, annuity or pension from any other source*" (emphasis added).

In enacting this provision, the Legislature overrode the veto of Governor Francis W. Sargent, who stated that he was concerned about the costs to taxpayers.[6] It is important to note that § 4 (1) (*p*) was enacted the year following the enactment of a statute mandating that school districts provide a program of evaluation and placement of children with special needs. G. L.

---

[5]General Laws c. 32, § 3 (4A), inserted by St. 1992, c. 333, which we discuss *infra*, governs the purchase of credit by certain nonpublic school teachers for work performed before 1973.

[6]In a letter, the executive secretary of the State Board of Retirement urged the Governor not to support the bill, arguing that the term "nonpublic schools" had "far reaching effects" and would burden "states, cities, towns, and county systems." He also stated that Social Security payments were a possible loophole because they were "possibly" insurance, and not a retirement benefit.

c. 71B, inserted by St. 1972, c. 766, § 11. General Laws c. 71B authorized school districts to enter into contracts with private schools, agencies, or institutions to provide an appropriate educational environment for such children where the school district itself could not. *Commonwealth* v. *School Comm. of Springfield*, 382 Mass. 665, 667-668 (1981) (holding that entering into contracts with nonpublic schools did not violate art. 46, § 2, as amended by art. 103, of the Amendments to the Massachusetts Constitution prohibiting aid to nonpublic schools).

In October, 1974, the board voted to request an opinion from the Attorney General concerning the exact issue we are asked to decide: whether Social Security benefits qualified as "a retirement allowance, annuity or pension from any other source" under the statute. The Attorney General responded that the provision appeared to be an effort on the part of the Legislature to "fill a gap in the pension laws for public service rendered but not otherwise credited [and was] aimed at precluding any unjust double credit." He stated that the provision was limited to service in nonpublic schools where tuition is financed in full or part by the Commonwealth. He stated that the terms "retirement allowance," "pension," and "annuity" are defined in G. L. c. 32, § 1, with reference to the State system, not the Federal system.[7] He stated that Social Security was not just a retirement system and was not referred to explicitly in the statute. See note 11, *infra*. He reasoned that, because any employment in a nonpublic school would be covered by the Social Security Act, to interpret the language of § 4 (1) (*p*) to exclude service covered by Social Security benefits would render the statutory provision "a nullity and frustrate the legislative intent." Rep. A.G., Pub. Doc. No. 12, at 92, 93-94 (1975).

For almost thirty years, from 1975 until 2004, the board interpreted § 4 (1) (*p*) to permit eligible members to purchase credit without regard to their eligibility for Social Security benefits. CRAB also abided by this interpretation of the statute.

---

[7]"Retirement allowance" is defined as "the sum of the amount of the annuity and the amount of the pension provided for in [§§ 1-28] inclusive." G. L. c. 32, § 1. "Annuity" is defined as "payments dependent upon the continuance of life of any member and derived from his accumulated regular deductions [and additional deductions] or from both." *Id.* "Pension" is defined as "payments dependent upon the continuance of life of any member or beneficiary and derived from contributions made by the appropriate governmental unit." *Id.*

2. Almost twenty years after it enacted § 4 (1) (*p*), the Legislature added § 3 (4A) to G. L. c. 32, inserted by St. 1992, c. 333. See note 5, *supra*. Section 3 (4A) also governs the purchase of credit for certain services in nonpublic schools before 1973, and has similar, but not identical, language to § 4 (1) (*p*). It states, in relevant part:

> "Any member in service . . . of the teachers' retirement system . . . and who was previously engaged in teaching pupils or as an administrator in a nonpublic school prior to January [1, 1973,] may . . . pay into the annuity savings fund . . . with a maximum credit for service in nonpublic schools not to exceed ten years; provided that *no credit shall be allowed and no payment shall be accepted for any service on account of which the member shall be entitled to receive a retirement allowance or other similar payment from the nonpublic school system, the federal government or any other source* . . ." (emphasis added).

G. L. c. 32, § 3 (4A), as appearing in St. 1994, c. 60, § 63.

It appears that this bill was advocated by members who were former nuns who had previously taught in private religious schools, and who were excluded from participating in the Social Security system prior to 1973. The limiting language "no credit shall be allowed and no payment shall be accepted for any service on account of which the member shall be entitled to receive a retirement allowance or other similar payment from the nonpublic school system, the federal government or any other source" was suggested by Governor William F. Weld, who was concerned that, without such language, the provisions could be interpreted to include not only the target group of teachers (i.e., those not covered by Social Security before 1973), but also any member whose nonpublic school did not have a pension program before 1973.[8] The Legislature, however, did not amend § 4 (1) (*p*) to mirror § 3 (4A).

3. In 1999 and 2000, the Appeals Court interpreted certain

[8]In 1992, a memorandum to Governor Weld from his legal counsel pointed out that the bill that would become § 3 (4A) was advanced by former nuns, estimated to number between one hundred to 200 members, ineligible for Social Security benefits.

provisions of §§ 3 (4A) and 4 (1) (*p*). See *Flaherty* v. *Contributory Retirement Appeal Bd.*, 48 Mass. App. Ct. 132 (1999) (*Flaherty*); *Dube* v. *Contributory Retirement Appeal Bd.*, 50 Mass. App. Ct. 21 (2000) (*Dube*). In *Flaherty*, the plaintiff was a member who had earned service credit before and after 1973. Therefore, she applied for a total of fourteen years of credit, under both G. L. c. 32, § 3 (4A), and § 4 (1) (*p*). *Flaherty, supra* at 133-134. In affirming the decision of CRAB that the plaintiff was not entitled to a maximum of ten years under *each* statutory provision, the court stated that the two provisions were related and that the maximum creditable service a member could receive was ten years. *Id.* at 134-135. The focus in *Dube* was on the exclusionary language in § 3 (4A) that references payments by the Federal government, language that is absent from § 4 (1) (*p*). *Dube, supra* at 22. The parties in *Dube* did not dispute whether the reference, in § 3 (4A), to the Federal government as a source of "retirement allowance or other similar payment" covered Social Security payments. *Id.* at 22-23. Instead, the plaintiff argued that the earnings through which he could receive Social Security benefits did not come solely from his employment in a nonpublic school and, thus, the exclusion in § 3 (4A) did not apply to him. *Id.* at 23. The court stated that § 3 (4A) contained no provision that nonpublic school service had to be the sole source of the work entitling an individual to Social Security benefits and affirmed the denial of the plaintiff's request to purchase credit. *Id.* at 24.

4. In 2004, a member whose material circumstances mirror those of these plaintiffs requested that she be allowed to purchase credit. The board denied her request and apparently argued before DALA that Social Security benefits fell under the exclusion in § 4 (1) (*p*), because of *Flaherty* and *Dube*. The administrative magistrate agreed, concluding that the two provisions had to be construed as a harmonious whole. Duprey-Gutierrez *vs.* Teachers' Retirement Bd., CRAB Docket No. CR-04-0195 (June 4, 2004).[9]

---

[9]There is nothing in the record indicating whether, in the years between the Appeals Court's decisions and this 2004 decision, the board was faced with any requests to purchase credit in the circumstances presented here and, if so, whether it continued to allow the purchase of credit without regard to a teacher's eligibility for Social Security benefits.

In the cases before us, CRAB affirmed the board's denial of the plaintiffs' eligibility to purchase credit under § 4 (1) (*p*) by summarily adopting the administrative magistrate's reasoning that controlled in *Dube* and *Flaherty*. Indeed, according to CRAB, it did not do its own analysis of the new arguments advanced by the board until 2008, in Sigman *vs.* Teachers' Retirement Sys., CRAB Docket No. CR-05-0534 (Dec. 23, 2008), a case involving facts virtually identical to those present here. In rejecting the board's determination that Sigman could not purchase credit for his nonpublic school service from 1972 to 1975, CRAB stated that the board's assumption that the *Flaherty* and *Dube* cases rejected the Attorney General's 1975 opinion was erroneous because the cases did not address the specific issue of Social Security benefits under § 4 (1) (*p*). CRAB concluded that the difference in the relevant language between § 3 (4A) and § 4 (1) (*p*) was significant given that the Legislature, which is presumed to have been aware of the language of § 4 (1) (*p*) when it enacted § 3 (4A), chose not to amend § 4 (1) (*p*). CRAB also stated that it would not add words to § 4 (1) (*p*). The board filed a motion for reconsideration of the Sigman decision, which was denied; it did not appeal.

CRAB brought the Sigman decision to the attention of the judge below. Although his subsequent written memorandum and order did not refer to it, the judge did reject the reasoning of the 1975 Attorney General's opinion on which CRAB relied. Instead, the judge stated that, under *Dube*, §§ 3 (4A) and 4 (1) (*p*) needed to be construed in harmony and, therefore, "an exclusion of Social Security beneficiaries from the benefits bestowed by § 3 (4A) would necessitate a similar bar under § 4 (1) (*p*)." He further stated that because the plain language of the statutes states that a retirement allowance, pension, or annuity from "any other source" is excluded from creditable service, and because "Social Security beneficiaries are, inherently, retirement beneficiaries," the plaintiffs were "barred from purchasing creditable service."

*Discussion.* The plaintiffs and CRAB argue that the *Flaherty* and *Dube* cases do not require the result the board and the judge reached. We agree.

In *Flaherty*, the court's conclusion that the two provisions should be read together was in the context of identical and

specific language in § 3 (4A) and § 4 (1) (*p*) limiting the maximum amount of credit a qualified member may purchase to ten years. By contrast, the statutory provisions in our cases do not involve identical language. Moreover, in *Dube*, the court interpreted a portion of § 3 (4A), not § 4 (1) (*p*), and it was not disputed that the language in § 3 (4A) covered Social Security benefits.

Because the board's reliance on *Flaherty* and *Dube* was error, the issue is whether, as the board now argues, its almost thirty-year interpretation of § 4 (1) (*p*) was erroneous.[10]

"Where an agency determination involves a question of law, it is subject to de novo judicial review." *Flemings* v. *Contributory Retirement Appeal Bd.*, 431 Mass. 374, 375 (2000). The duty of statutory interpretation is for the courts, but where an agency's determination is reasonable, a court does not substitute its own judgment. *Id.*, quoting *Dowling* v. *Registrar of Motor Vehicles*, 425 Mass. 523, 525 (1997). In the particular circumstances of these cases, although we give no deference to CRAB, we are mindful that if the language of a statute is ambiguous, "contemporary administrative construction, especially if long continued, is of significance." *Wellington* v. *Commissioner of Corps. & Taxation*, 359 Mass. 448, 452 (1971), quoting *Assessors of Holyoke* v. *State Tax Comm'n*, 355 Mass. 223, 243-244 (1969). "An administrative interpretation developed during, or shortly before, the litigation in question is entitled to less weight than that of a long-standing . . . interpretation." *Mullally* v. *Waste Mgt. of Mass., Inc.*, 452 Mass. 526, 533 n.13 (2008), quoting 1A N.J. Singer, Sutherland Statutory Construction § 31.6, at 730 (6th ed. rev. 2002).

The board argues that the "plain language" of the two provisions shows that they are identical in scope; that the use of the word "any" in the phrase "any other source" necessarily means

---

[10]The plaintiffs, citing G. L. c. 30A, §§ 2-3, argue that the board did not follow any rule making or "Board process" when it changed its interpretation of § 4 (1) (*p*), nor did it ask the opinion of the Attorney General or notify its members. The board counters that it did not change its policy but responded to case law. Citing *Commissioner of Revenue* v. *BayBank Middlesex*, 421 Mass. 736, 741 (1996), the board further argues that, even if it did change policy, it is free to change policy if it has reasonable grounds for doing so. We need not resolve this issue because of our conclusion that the original interpretation of the statute was not erroneous.

that the Legislature intended a broad interpretation of the exemption in both provisions; and that, in ascribing identical meaning to the two provisions, they are following the holding in *Flaherty* that the two must be read to create a harmonious whole. We address each in turn.

First, we do not agree with the board that the language in § 4 (1) (*p*) is unambiguous. If it were as clear as the board now claims, the board would not have had the need to ask the Attorney General for clarification as to whether its terms incorporated Social Security benefits.

Second, although the word "any" could mean that the Legislature intended a broad interpretation of the phrase "any other source," in this context, such an intent is not clear. In § 4 (1) (*p*), members are barred from purchasing credit if they are "entitled to receive a retirement allowance, annuity or pension from any other source." In § 3 (4A), members are barred from purchasing credit if such members are "entitled to receive a retirement allowance or other similar payment from the nonpublic school system, the federal government or any other source." Relying on what the judge referred to as a common understanding of Social Security, the board argues that the difference in language is not significant because Social Security is a "retirement allowance . . . from any other source" under § 4 (1) (*p*). This argument has superficial appeal, but does not explain why, if the "any other source" language so clearly incorporated Social Security benefits, the Legislature would have added different words, including a specific reference to the "federal government," when it enacted § 3 (4A). Moreover, the terms "retirement allowance," "annuity," and "pension" are defined in G. L. c. 32, §§ 1-28, and do not reference Federal statutes. See note 7, *supra*. In addition, even assuming that the board is correct that the common understanding is that Social Security is a retirement benefit, this does not answer the two important questions here: whether it was commonly understood to be so in 1973,[11] and whether the Legislature intended the language to incorporate Social Security payments.

---

[11] In 1975, the Attorney General did not view it as a retirement allowance, stating, "[T]he Social Security System sounds in the tenor of 'Old Age, Survivors and Disability Insurance Benefits' (see 42 U.S.C.A. §§ 401 et seq.), yet no reference is made in [St. 1973,] c. 760 to 'insurance benefits' or directly

Furthermore, adopting the board's interpretation would render the phrase in § 3 (4A), "or other similar payment from . . . the federal government," superfluous. *Bynes* v. *School Comm. of Boston*, 411 Mass. 264, 268 (1991) (statute should not be read to render its terms meaningless or superfluous). It also would require adding words to § 4 (1) (*p*) that the Legislature did not include, which we decline to do. See *Commissioner of Correction* v. *Superior Court Dep't of the Trial Court for the County of Worcester*, 446 Mass. 123, 126 (2006), citing *General Elec. Co.* v. *Department of Envtl. Protection*, 429 Mass. 798, 803 (1999) ("We do not read into [a] statute a provision which the Legislature did not see fit to put there, nor add words that the Legislature had an option to, but chose not to include"); *Commonwealth* v. *Galvin*, 388 Mass. 326, 330 (1983), quoting *Beeler* v. *Downey*, 387 Mass. 609, 616 (1982) ("where the Legislature has employed specific language in one paragraph, but not in another, the language should not be implied where it is not present"). Clearly, where the Legislature wanted to include a reference to payments by the Federal government, it has so provided. See *Roberts* v. *Enterprise Rent-A-Car Co. of Boston*, 438 Mass. 187, 192 (2002), *S.C.*, 445 Mass. 811 (2006); *Tax Collector of N. Reading* v. *Reading*, 366 Mass. 438, 443 (1974).

Moreover, G. L. c. 32, § 3 (4), inserted by St. 1945, c. 658, § 1, a provision enacted before § 4 (1) (*p*), which is referenced in the Attorney General's opinion, allows a member who taught in out-of-State schools to purchase credit unless the member is "entitled to receive a retirement allowance from any other state." At oral argument, counsel for the board stated that, under the language of § 3 (4), such a member could purchase credit even if they could receive Social Security benefits. Viewing § 4 (1) (*p*) in light of this provision, and taking into consideration that satisfying the law requiring public schools to educate students with special needs often comes through the placement of the students in private institutions, we conclude that it does not seem likely that the Legislature would have permitted members who taught out-of-State to purchase credit without regard to whether they

---

to the Social Security System itself." Moreover, as discussed in note 6, *supra*, the possibility that Social Security might not be included in § 4 (1) (*p*)'s exclusion was also on the mind of the executive director of the State Board of Retirement.

had Social Security benefits, yet deny it to members who taught the Commonwealth's children in-State, albeit in a nonpublic school. See *Kennedy* v. *Contributory Retirement Appeal Bd.*, 47 Mass. App. Ct. 425, 428 (1999), quoting *Murphy* v. *Department of Correction*, 429 Mass. 736, 739 (1999) (rational for Legislature to reward teachers who make significant contribution to Commonwealth). In addition, given the different circumstances that § 4 (1) (*p*) and § 3 (4A) were addressing, the Legislature could have determined that it wanted to permit all members who taught in nonpublic schools where tuition was financed in full or in part by the Commonwealth to be able to purchase credit, but wanted to limit the number of teachers' retirement system members who taught in all nonpublic schools before 1973 to just those who were prohibited from participating in Social Security (i.e., nuns who taught in private religious schools). See generally Schobel, Characteristics of Newly Awarded Recipients of the Social Security Regular Minimum Benefit, 45 Social Security Bull. 11, 11, 15 (1982) (noting that religious orders were first permitted to cover such persons under Social Security "as a result of the 1972 amendments").

Our conclusion that the Legislature intended to impose different limits on the purchase of credit under § 3 (4A) and § 4 (1) (*p*) also explains the reasons the Legislature chose not to amend § 4 (1) (*p*) when it enacted § 3 (4A). *Suliveres* v. *Commonwealth*, 449 Mass. 112, 116-117 (2007) (courts are to assume that legislators are aware of existing law, and "scholarship and attitudes" pertaining to subject of statute). Therefore, although we do not disagree with the statement in *Flaherty*, *supra* at 134, that the two provisions should be read in harmony, see *Board of Educ.* v. *Assessor of Worcester*, 368 Mass. 511, 513-514 (1975), we conclude that interpreting the provisions to impose different limits on members does not compel the conclusion that the interpretation is not harmonious.[12]

For these reasons, we conclude that Social Security benefits

---

[12]The board argues that the Attorney General's statement that to exclude those who were eligible to receive Social Security benefits would make the law a nullity "rests on an assumption that never came to pass." We do not see how the board is able to conclude that it never came to pass given that, for almost thirty years, the broader interpretation was applied.

In addition, the board argues that there were bills introduced in the Legislature,

are not covered by the exclusion of § 4 (1) (*p*). Mindful of the long-standing interpretation of § 4 (1) (*p*), we conclude that any change in interpretation is for the Legislature to address. *Wellington* v. *Commissioner of Corps. & Taxation*, 359 Mass. 448, 452 (1971).

*Conclusion.* The judgments of the Superior Court affirming CRAB's denial of the plaintiffs' requests to purchase service credit are reversed and the cases are remanded to the Superior Court for further proceedings consistent with this opinion.

*So ordered.*

after the 2004 interpretation of § 4 (1) (*p*), that would have allowed more members to purchase credit, but that the Legislature chose not to enact them, as evidence that its interpretation of the statute is correct. Bills that fail to be enacted are an unreliable basis on which to infer the intent of a statute, *Alves's Case*, 451 Mass. 171, 178 (2008), quoting *Massachusetts Comm'n Against Discrimination* v. *Liberty Mut. Ins. Co.*, 371 Mass. 186, 193-194 (1976) ("Legislature's failure to enact proposed bill amending [statute] was 'hazardous basis' on which to infer intent of earlier version of statute"). We also note that one of the proposed bills to which the board points would have amended § 4 (1) (*p*) specifically, but it applied only to the first sentence, whereas at issue here is the second sentence.

The board also contends that the fact that the Legislature chose not to rewrite the relevant provision in § 4 (1) (*p*) when it amended the statute in 2009 "is at least some indication that it does not feel an urgent need for change in response to [the board's] interpretation of nonpublic school service purchase rights." Given the support for our analysis of the two provisions, we are not persuaded by this argument.